## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRAD ALLEN CAMPANARO,<br><br>Plaintiff,<br><br>CAROLYN W. COLVIN,<br>ACTING COMMISSIONER OF<br>SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 3:12-cv-01527-WJN-GBC<br><br>(JUDGE NEALON)<br><br>(MAGISTRATE JUDGE COHN)<br><br>REPORT AND RECOMMENDATION TO VACATE THE DECISION OF THE COMMISSIONER AND REMAND THE CASE TO THE COMMISSIONER FOR FURTHER PROCEEDINGS<br><br>Docs. 1, 7, 8, 11, 12, 13 |

## REPORT AND RECOMMENDATION

### I. Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Brad Campanaro's applications for social security disability insurance benefits and supplemental security income benefits. Plaintiff contends that the Administrative Law Judge ("ALJ") erred in failing to acknowledge several medically determinable impairments established by his medical records. Plaintiff also contends that the ALJ erred in discounting his treating physician's opinion and Plaintiff's testimony that Plaintiff cannot sit or stand still for more than fifteen minutes. Plaintiff contends that that the ALJ erred in discounting the opinion and his testimony because the ALJ cited to "inconsistencies" that were not actually inconsistent and ignored substantial, objective evidence that corroborated the opinion and his testimony. For the reasons that follow, the Court finds that the ALJ erred in ignoring many of Plaintiff's medically determinable impairments and erred in

discounting his testimony and the opinion of his treating physician.  Therefore, the Court recommends that  the Commissioner's decision be vacated and Plaintiff's case be remanded for further proceedings.

## II. Procedural Background

On February 6, 2011, Brad Allen Campanaro ("Plaintiff") protectively filed an application for Supplemental Security Income benefits under Title XVI of the Social Security Act and for disability insurance benefits ("DIB") under Title II of the Social Security Act. (Tr. 47, 139-147).[1]

On May 17, 2011, the Bureau of Disability Determination[2] denied this application, and Plaintiff filed a request for hearing on July 7, 2011.  (Tr. 57-68, 79-80). On February 1, 2012, a hearing was held before an ALJ at which Plaintiff, who was represented by an attorney, and a vocational expert appeared and testified (Tr. 25-46). On March 9, 2012, the ALJ found that Plaintiff was not disabled and thus was not entitled to benefits. (Tr. 14-24). On May 2, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 13), which the Appeals Council denied on June 28, 2012, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-5).

On August 6, 2012, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On October 17, 2012, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 7, 8). On January 3, 2013, Plaintiff filed a brief in support of his appeal ("Pl. Brief") (Doc. 11). On

---

[1] References to "Tr." are to pages of the administrative record filed by the Defendant as part of her Answer on February 4, 2013.

[2] The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration. Tr. 77-78.

February 4, 2013, Defendant filed a brief in response ("Def. Brief") (Doc. 12), and on February 19, 2013, Plaintiff filed a reply brief ("Pl. Reply") (Doc. 13). On May 1, 2014, the Court referred this case to the undersigned Magistrate Judge.

### III.    Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether the denial is supported by substantial evidence. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 564 (1988); Hartranft v. Apfel, 181 F.3d 358, 360. (3d Cir. 1999); Johnson, 529 F.3d at 200. This is a deferential standard of review. See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence is satisfied without a large quantity of evidence; it requires only "more than a mere scintilla" of evidence. Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). It may be less than a preponderance. Jones, 364 F.3d at 503. Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986).

### IV.    Review of ALJ Decision

To receive disability or supplemental security benefits, Plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that "he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

A five-step evaluation process is used to determine if a person is eligible for disability benefits. See 20 C.F.R. § 404.1520; see also Plummer, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further. See 20 C.F.R. § 404.1520.  The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. See 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity (RFC).  Id. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that she is unable to engage in past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can

perform. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff. <u>See</u> 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

At step two, the social security regulations contemplate that the administrative law judge first consider whether there are any medically determinable impairments and then determine whether any of the medically determinable impairments are "severe." 20 C.F.R. § 404.1529.  An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities.  <u>Id.</u> § 404.1521;   Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. <u>Id.</u>   An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual ability to work.  <u>Id.</u> § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

The determination of whether a claimant has any medically determinable, severe impairments is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limit the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. <u>Id.</u>  If a claimant has any severe impairments, the evaluation process continues.  <u>Id.</u> § 404.1520(d)-(g).  Thus, a failure to find a medical condition severe at step two will not render a decision defective if some other medical condition was found severe at step two and both severe and non-severe impairments are considered at subsequent steps.

However, failing to find an impairment to be medically determinable can render a decision defective at step two. This is because both severe and non-severe medically determinable impairments are considered at step three, in the RFC analysis, and at steps four and five. Christenson v. Astrue, Civil No. 10-1192, slip op. at 12 (M.D. Pa. May 18, 2011) (Muir, J.); Little v. Astrue, Civil No. 10-1626, slip op. at 19-21 (M.D. Pa. September 14, 2011) (Kosik, J.); Crayton v. Astrue, Civil No. 10-1265, slip op. at 32-35 (M.D. Pa. September 27, 2011) (Caputo, J.); Shannon v. Astrue, Civil No. 11-289, slip op. at 39-41 (M.D. Pa. April 11, 2012) (Rambo, J.); Bell v. Colvin, Civil No. 12-634, slip op. at 23-24 (M.D. Pa. Dec. 23, 2013) (Nealon, J.); 20 C.F.R. §§ 404.1523, 404.1545(a)(2). While limitations attributed to impairments which are medically determinable but are not severe must be considered at later steps in the evaluation, alleged limitations attributable to impairments which are not medically determinable *must not* be considered at later steps. 20 C.F.R. §§ 416.908, 416.923; see also Rutherford v. Barnhart, 399 F.3d 546, 554, n.7 (3d Cir. 2005) (to be considered, an impairment must be medically determinable, but need not be "severe").

At step 3, the ALJ is required to develop a record sufficient to allow judicial review of the step three finding. Conclusory findings at step three may preclude meaningful judicial review where there is insufficient development of the record or explanation of findings. Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112 (3d Cir. 2000); Lopez v. Comm'r of Soc. Sec., 270 F. App'x 119, 121 (3d Cir. 2008) ("Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis. Rather, the function of Burnett is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review."). However, if the ALJ elsewhere discusses the factors pertinent to an

evaluation of the listings, and the court is able to engage in meaningful review, the ALJ's step

three determination can be supported by substantial evidence:

> In this case, the ALJ's decision, read as a whole, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that Jones did not meet the requirements for any Listing, including Listing 3.02(A). The ALJ's opinion discusses the evidence pertaining to chronic obstructive and restrictive lung disease, specifically referencing "[p]ulmonary function studies ... consistent with moderately severe obstructive and restrictive defects," but pointing to the lack of pulmonary complications, and a finding that claimant's lungs were clear. Also, the ALJ noted that claimant's medical history showed no frequent hospitalization or emergency treatments.

Lopez, 270 F. App'x at 121-22 (3d Cir. 2008); Hur v. Barnhart, 94 F. App'x 130, 133 (3d Cir.

2004)("There is no requirement that the ALJ discuss in its opinion every tidbit of evidence

included in the record.").

   If the ALJ finds that the claimant has at least one medically determinable, severe

impairment, but that claimant's impairments, considered in combination, do not meet a listing,

the ALJ must undertake an RFC analysis to determine if the claimant can perform past relevant

work or other work in the national economy. RFC is an assessment of the most a claimant can do

on a regular and continuing basis despite credible limitations. 20 C.F.R. § 404.1545(a).  It is an

administrative assessment, based on all the evidence, of how a claimant's impairments and

related symptoms affect her ability to perform work-related activities. Id. Rarely can a decision

be made regarding a claimant's residual functional capacity without an assessment from a

physician regarding the functional abilities of the claimant. See Doak v. Heckler, 790 F.2d 26, 29

(3d Cir.1986) ("No physician suggested that the activity Doak could perform was consistent with

the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that

he could is not supported by substantial evidence."); 20 C.F.R. § 404.1545(a). As two

commentators have explained:

> Sometimes administrative law judges assert that they - and not physicians - have the right to make residual functional capacity determinations… <u>However, the underlying determination is a medical determination, i.e., that the claimant…can stand for 30 minutes, two hours, six hours, or eight hours</u>. That determination must be made by a doctor.  Once the doctor has determined how long the claimant can sit, stand or walk, and how much weight the claimant can lift and carry, then the ALJ, with the aid of a vocational expert if necessary, can translate that medical determination into a residual functional capacity determination.

Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law and Procedure in Federal Courts, 344-345 (2014) (emphasis added). An ALJ must not overly rely on activities of daily living. <u>Fargnoli v. Massanari,</u> 247 F.3d 30, 40 n.5. (3d Cir.2001) ("[S]poradic and transitory activities cannot be used to show an ability to engage in substantial gainful activity.").

An ALJ must weigh medical opinions in making an RFC assessment. The social security regulations state that when the opinion of a treating physician is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it is to be given controlling weight. 20 C.F.R. § 416.927(d)(2).  Section 404.1527(c) establishes the factors to be considered by the ALJ when the opinion of a treating physician is not given controlling weight. Under subsections (c)(1) and (c)(2), the opinions of treating physicians are given greater weight than opinions of non-treating physicians and opinions of examining physicians are given greater weight than opinions of non-examining physicians, as discussed above. Section 404.1527(c)(2) also differentiates among treating relationships based on the length of the treating relationship and the nature and extent of the treating relationship. Subsection 404.1527(c)(3) provides more weight to opinions that are well supported, which means that "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight

we will give that opinion." Subsection 404.1527(c)(4) states that "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." Subsection 404.1527(c)(5) provides more weight to specialists, and subsection 404.1527(c)(6) allows consideration of other factors which "tend to support or contradict the opinion."

In Morales v. Apfel, 225 F.3d 310 (3d Cir. 2000), the Third Circuit set forth the standard for evaluating the opinion of a treating physician, stating that:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Plummer [v. Apfel, 186 F.3d 422, 429 (3d Cir.1999)] (quoting Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir.1987)); see also Adorno v. Shalala, 40 F.3d 43, 47 (3d Cir.1994); Jones, 954 F.2d at 128; Allen v. Bowen, 881 F.2d 37, 40-41 (3d Cir.1989); Frankenfield v. Bowen, 861 F.2d 405, 408 (3d Cir.1988); Brewster, 786 F.2d at 585. The ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." Plummer, 186 F.3d at 429 (citing Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993)). The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled. See Adorno, 40 F.3d at 48. In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion. Plummer, 186 F.3d at 429; Frankenfield v. Bowen, 861 F.2d 405, 408 (3d Cir.1988); Kent, 710 F.2d at 115.

Id. at 317-318.

When using internal inconsistencies to discredit a treating physician's report, the internal discrepancies must be truly contradictory:

> The ALJ's decision to discredit Dr. Picciotto, the consultative psychological examiner who evaluated Brownawell in December 2000, is similarly improper. Dr. Picciotto provided a medical source statement which indicated that Brownawell "had poor ability (no ability) [sic] to function in several areas." A.R. at 303. The ALJ discounted this finding because it "was inconsistent with and unsupported by the text of the evaluation and the clinical signs and findings in the remaining medical record." Id. In support of this contention, the ALJ notes that Dr. Picciotto "stated that [Brownawell] has no ability to maintain attention or concentration[, but] he reported in the text of the evaluation that [she] has good focus, good attention, and good concentration." These assessments are not

necessarily contradictory, however, as one assessment was describing Brownawell's condition at the time of Dr. Picciotto's examination and the other reflected Dr. Picciotto's assessment of Brownawell's ability to function in a work setting. As discussed *supra,* this Court has admonished ALJs who have used such reasoning, noting the distinction between a doctor's notes for purposes of treatment and that doctor's ultimate opinion on the claimant's ability to work. See Morales*,* 225 F.3d at 319.

Brownawell v. Comm'r Of Soc. Sec., 554 F.3d 352, 356 (3d Cir. 2008).

Given the recognition of the great weight that should attach to the professional judgment of treating physicians, it is axiomatic that an ALJ must provide an adequate explanation for any decision which chooses to disregard a treating physician's findings regarding illness, impairment, and disability. Moreover, when an ALJ fails to adequately explain why a treating physician's medical assessment has been discounted, a remand for further development of the factual record is proper. See, e.g., Burnett v. Commissioner of Social Security, 220 F.3d 112, 119 (3d Cir. 2000) (failure to adequately discuss competing medical evidence compels remand of ALJ decision); Shaudeck v. Comm'r of Social Security, 181 F.3d 429 (3d Cir. 1999); Allen v. Brown, 881 F.2d 37, 40-41 (3d Cir. 1989).

Where a disability determination turns on an assessment of the level of a claimant's pain, the social security regulations provide a framework under which a claimant's subjective complaints are to be considered. See 20 C.F.R. § 404.1529. Such cases require the ALJ to "evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work." Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999). Cases involving an assessment of subjective reports of pain "obviously require[ ]" the ALJ "to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." Id. Pursuant to the social security regulations, subjective symptoms, such as pain, shortness of breath, and fatigue, will only be considered to affect a

claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings.  20 C.F.R. § 404.1529(b).  Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work. 20 C.F.R. § 404.1529(b). SSR 96-4p provides that "allegations about the intensity and persistence of the symptoms must be considered with the objective medical abnormalities, and all other evidence in the case record, in evaluating the functionally limiting effects of the impairment(s)." Id.

### V. Relevant Facts in the Record

Plaintiff was born on February 28, 1963, and was classified by the regulations as a "younger individual" through the date of the ALJ decision. 20 C.F.R. § 404.1563. (Tr. 47). He has at least a high school education and past relevant work as an electronic technician and a truck driver. (Tr. 20). Plaintiff is insured through December 31, 2015. (Tr. 150). Plaintiff reported on his Disability Report and Function Reports that he could feed his animals, do chores if needed, and make dinner. (Tr. 172).  He reported that he could clean once a week, mow the lawn once a week for two hours during summer, go shopping twice a month for an hour, do laundry without assistance, and go hunting and fishing once a year "when the pain isn't bad," although Plaintiff has to "watch walking too far or standing too long."  (Tr. 173, 174). He also reported that he could not sleep comfortably because of pain and can no longer sit for long periods of time, lift heavy objects, or bend over. (Tr. 172). He reported that he can walk for no more than one block at a time. (Tr. 176).

At the hearing before the ALJ, Plaintiff testified that he suffers from "pulling and tingling

going up [his] legs" whenever he walks up stairs. (Tr. 31). Plaintiff testified that he could walk no more than halfway up his block before he has tingling and pain in his legs that requires him to stop. (Tr. 31). Plaintiff also testified that he can only stand in one place for ten minutes at a time and suffers the same problems when sitting still (Tr. 32).  He testified that his pain medications were helping. (Tr. 33). He testified that his former supervisor at his most recent job allowed him to "get up and stand or move around and constantly . . . walk to the bathroom and come back." (Tr. 33). He testified that he was fired when a new supervisor arrived and was not tolerant of his need to move around constantly. (Tr. 35).  Plaintiff discussed the side effects of his medicine, and explained that he could drive no more than fifty minutes while on his strongest dose of pain medication. (Tr. 37-38). He testified that he could engage in daily activities, but only with breaks, and that his daughter would usually do "harder" cleaning, like vacuuming and laundry. (Tr. 38). Plaintiff testified that he made an effort to try and switch careers when he was no longer able to work as a truck driver by receiving vocational training and working in electronics. (Tr. 39-40).

The vocational expert testified that Plaintiff was unable to do any of his past relevant work. (Tr. 43). Then, the ALJ provided the vocational expert with a series of hypotheticals. First, he restricted Plaintiff to sedentary work, with no foot control operations, and work that only occasionally required stairs, ladders, balancing, stopping, kneeling, crouching, or crawling. (Tr. 43). The vocational expert testified that Plaintiff could work as a bonder semiconductor (400 jobs locally, 2,700 in several regions, 68,000 nationally), a surveillance system monitor (600 jobs locally, 3,300 in several regions, and 83,000 nationally), and a call out operator (1,600 locally, 10,000 in several regions, and 252,000 nationally). (Tr. 43). The vocational expert testified that

with the additional limitations of never climbing ladders and a "sit/stand" option, the same jobs would remain, but would decline in numbers by about ten percent. (Tr. 43-44). Upon questioning by counsel for the Plaintiff, the vocational expert testified that if Plaintiff needed to move away from the station every fifteen minutes, then there would be no competitive employment. (Tr. 45).

### a.      Medical Records

### 1.  Back Pain and Spine Issues

On September 25, 2002, Plaintiff injured his back while working as a truck driver. (Tr. 279). He had worked as a truck driver for sixteen years. (Tr. 293).  Between the time of the accident and December 18, 2002, Plaintiff received three epidural steroid injections ("ESI") at the L5-S1 level on his lumbar spine to treat his pain. (Tr. 279). These injections were performed by Dr. Norman Haueisen. (Tr. 279). On January 22, 2003, Dr. Haueisen noted that Plaintiff's pain in his lower back continued, so he prescribed Vicodin and referred Plaintiff to Dr. Steven Wolf  for evaluation and treatment  of his back pain. (Tr. 290). His notes state "I think this gentleman does have low back pain. I am not certain of the etiology." (Tr. 290).

On March 4, 2003, X-rays showed no obvious areas of instability on Plaintiff's flexion extension, but did show that he had spondylitic[3] changes and degenerative disc disease[4] throughout. The X-rays also showed that he had spurring[5] and collapse, especially at L4-5. The X-rays showed ossification[6] of his anterior longitudinal ligament at several areas and facet joint disease. Dr. Wolf's notes indicate that Plaintiff "has more degenerative changes than I would

---

[3] Spondylitis is defined as "[i]nflammation of a vertebra or of vertebrae." 5-S Attorneys' Dictionary of Medicine S-108649.

[4] Degenerative disc disease is "arthritis in the back, caused by the aging process." 5-15 Attorneys' Textbook of Medicine (Third Edition) P 15.300.

[5] A spur is "[a] small, pointed outgrowth, usually of bone." 5-S Attorneys' Dictionary of Medicine S-108821.

[6] Ossification is defined as "[t]he abnormal conversion into bone of a soft tissue which is not intended to be bone." 4-O Attorneys' Dictionary of Medicine O-84799

expect to see in someone his age." (Tr.  293). On the same day, Dr. Wolf evaluated an MRI

report that showed an asymmetric circumferential disc osteophyte[7] bulge on the left at L5-S1 and

foraminal narrowing,[8] especially at the left. (Tr. 293).  Dr. Wolf prescribed physical therapy,

Vicodin, and Motrin. (Tr. 293).  On March 11, 2003, Dr. Wolf mentioned that Plaintiff "has a

difficult time sitting for any length of time, he can't stand in one position for a long time and he

has a difficult time walking. . . . I am concerned that just doing a discectomy would not alleviate

his symptoms." (Tr. 294). Dr. Wolf also examined an MRI, which showed moderate disc

herniation and degeneration at L5-S1, but noted that the "other levels look fairly good." There

was no significant canal stenosis and only mild spinal stenosis[9] above L5. (Tr. 294).

On May 13, 2003, Plaintiff was still experiencing significant pain in his left leg, left low

back, and buttock check. (Tr. 295). Dr. Wolf's notes indicated that  "he's been through all

different types of conservative treatment" without success and recommended a

hemilaminectomy/discectomy of L5-S1. (Tr. 295). This procedure was performed by Dr. Wolf

on June 30, 2003. (Tr. 297).

Two weeks after the procedure, Dr. Wolf noted that Plaintiff felt much better and showed

marked improvement, although "[h]e certainly is not able to return to driving a truck right now."

(Tr. 298). Dr. Wolf prescribed physical therapy. (Tr. 298). However, two months after the

procedure, Dr. Wolf noted that Plaintiff continued to have left lower back pain and experienced

pain with bending and extended sitting, although the numbness Plaintiff previously reported in

---

[7] An osteophyte is a "[a]n outgrowth of bony tissue from a bone; an osteophyma; a spur of bone." 4-O Attorneys' Dictionary of Medicine O-84999.

[8] Foraminal narrowing is "narrowing of the space through which the spinal cord runs." 4-13A Attorneys' Textbook of Medicine (Third Edition) P 13A.00.

[9] Spinal stenosis is defined as "[a] narrowing of the spinal canal (the long channel within the bony structure of the spine), usually as a result of hypertrophic (pertaining to abnormal enlargement) degenerative changes of the bony structures." 5-S Attorneys' Dictionary of Medicine S-108246.

his leg was gone. (Tr. 300). Dr. Wolf examined Plaintiff's X-rays and found that they showed

anterior syndesmophyte[10] formation at L2-3, L3-4, and L4-5 and degeneration at L5-S1. (Tr.

299-300).

Plaintiff continued to see Dr. Wolf for his back pain. An X-ray on January 8, 2004 again

showed ossification from L2 to L5, collapse and degeneration, lateral syndesmophyte formation,

and a "hint of ossification" at L5-S1. (Tr. 302). Dr. Wolf noted fatigability on the left side and

pain in his left buttock on a straight leg raise. (Tr. 301). Dr. Wolf noted that Plaintiff required

several hydrocodone for pain "just to get through the day." (Tr. 301). Dr. Wolf started Plaintiff

on Prednisone to treat his pain. (Tr. 302). Dr. Wolf requested an MRI, which was performed on

January 16, 2004. Aside from mild disc space narrowing at L5-S1, the MRI showed normal

vertebral alignment, height, and disc space width. However, the MRI also showed Schmorl

Nodes at T12, L1, L4, and L5, mild degenerative type endplace signal change surrounding the

L5-S1 disc posteriorly, a left hemilaminectomy defect at L5, and diffuse bulging annulus at L3-4

and L4-5. The report also indicated that the "L5 and S1 nerve roots on the right are conjoined

which is a congenital variant." (Tr. 228-229).

On April 6, 2004, Plaintiff reported to Dr. Wolf that he had been having a lot of pain. Dr.

Wolf prescribed him Lortab, but "told him to try to use these sparingly." An MRI showed no

significant herniation, but did show scar tissue on the left side in the S1 nerve root.  Dr. Wolf

again noted the congenital conjoined nerve root and degenerative disc changes at LS-S1. Dr.

Wolf observed that "[h]is sitting tolerance is not great….he can't stand in one position for a long

---

[10] A syndesmophyte is "[a]n abnormal outgrowth from a ligament." 5-S Attorneys' Dictionary of Medicine S-112582

time." (Tr. 303). On May 27, 2004, Plaintiff returned to Dr. Wolf and continued to report back and left leg pain. (Tr. 304). Dr. Wolf reviewed a discogram, which again showed osteophytes at L4-5, scarring at L5-S1, and degenerative disc disease. He noted that the scarring at L5-S1 was affecting the S1 nerve root, which was causing Plaintiff's discomfort. (Tr. 304). He referred Plaintiff to Dr. Hartman for pain management and Dr. Dunn for another series of three ESIs. (Tr. 304). Plaintiff was taking Lortab two to three times a day. (Tr. 304). At a follow up for his back pain in August 2004, Dr. Wolf again observed "fatigability on the left side," a "positive tension sign on the left," and a "a positive lasegue [leg-raising] test." (Tr. 305).

An X-ray on November 23, 2004 showed "degenerative disc disease with collapse and some spurring." (Tr. 306). On November 24, 2004, he saw Dr. Wolf for another follow-up for leg and back pain. He reported that his ESIs helped him for about a week. Dr. Wolf also reviewed an MRI. The MRI showed "epidural fibrosis and granulation tissue on the left side" and degeneration at L5-S1. (Tr. 307). He had pain in his left leg with a straight leg raise. (Tr. 307).

On February 8, 2005, Plaintiff saw Dr. Wolf and reported that he was having an "awful lot" of discomfort in his back and leg. Dr. Wolf noted his belief that surgery might relieve Plaintiff's symptoms, and scheduled him for a decompression laminectomy L5 with revision to S1, bilateral foraminotomies, removal of epidural fibrosis and scar tissue with DePuy instrumentation L5-S1, bilateral posterior lateral effusion L5-S1, local bone Vitoss and harvesting of local bone. (Tr. 218, 228, 308).  A chest X-ray on March 3, 2005 noted degenerative changes in the thoracic spine, "similar to 6/20/2003." (Tr. 227).

Dr. Wolf performed the procedure on March 7, 2005. (Tr. 309). On admission, Dr. Wolf noted "[n]umbness in the leg" and that "[h]is MRI shows a lot of epidural fibrosis and granulation tissue on the left side at L5-S1." (Tr. 216). He had good strength and no sciatic nerve tension signs. (Tr. 217). After the procedure, Dr. Wolf diagnosed Plaintiff with spinal stenosis, L4 to S1 secondary to spondylosis; epidural fibrosis and scar tissue; degenerative disc disease, lumbosacral spine; and status post-decompression at L5-S1. (Tr. 222).

On March 22, 2005, Plaintiff saw Dr. Wolf for a follow-up. (Tr. 310). X-rays revealed that Plaintiff's instrumentation was in place, syndesmophyte formation at multiple levels, and no other change from prior films. (Tr. 311). Plaintiff reported that he was "exceedingly happy," could walk a mile a day, and had minimal complaints. (Tr. 312).On June 23, 2005, Plaintiff saw Dr. Wolf for a follow-up. (Tr. 312).  X-rays showed that the instrumentation remained in satisfactory position, that his bone graft was incorporating, and degeneration above his lumbar spine. (Tr. 313). Plaintiff reported that he had occasional back pain, especially when bending, but that he was able to stand better and walk better. Plaintiff was taking six Lortab tablets a day, but that he was "trying to cut down." (Tr. 312). Dr. Wolf indicated that he did not "want him lifting more than 25 pounds." (Tr. 312).

On September 15, 2005, Dr. Wolf referred Plaintiff to Dr. Mueller for chronic pain management. Plaintiff was prescribed Oxycontin and oxycodone, which allowed him to be "more functional" on a follow up in October of 2005. (Tr. 355). An X-ray from October 6, 2005, was identical to his X-ray on June 23, 2005. Plaintiff also followed up with Dr. Wolf on October 6, 2005. Plaintiff reported that he had mild numbness in his calf, that he has less back pain the more he moves, and that he still had "issues" but was doing better since surgery. (Tr. 314). He

had pain in the left leg on a straight leg raise. (Tr. 314). Plaintiff was taking Oxycontin, 20 mgs, two or three times a day. (Tr. 314).

On January 12, 2006, Plaintiff saw Dr. Mueller. Dr. Mueller's note indicated that Plaintiff was taking medications as directed without side effects, specifically Lortab two to three times per day and Oxycontin 20mg, but that he was experiencing end of dose failure with Oxycontin. (Tr. 356). On March 9, 2006, Plaintiff saw Dr. Wolf for a one-year follow up to his lumbar spine reconstruction procedures. (Tr. 315). X-rays showed satisfactory instrumentation and noted solid fusion at L5-S1. Again, Dr. Wolf noted the presence of ossification of his anterior longitudinal ligament at multiple areas in the lumbar spine and lateral syndesmophyte formation on the left side at L3-4. (Tr. 317). Plaintiff reported he had been doing pretty well and was "much more functional" after working with a chiropractor once a month. (Tr. 315). Plaintiff was taking Oxycontin, 20 mg, once or twice a day. Dr. Wolf noted that "Dr. Mueller is working with him for that and will eventually get Brad off the Oxycontin." (Tr. 315).

Plaintiff saw Dr. Mueller on April 20, 2006, who noted that Plaintiff's "[p]ain controlled on current regimen allows to be more functional." (Tr. 356). Plaintiff was on the same regimen of Lortab and Oxycontin. (Tr. 356). Plaintiff saw Dr. Mueller on July 13, 2006, and again reported no tolerance, a good activity level, and that pain control was "good" on the same regimen of Lortab and Oxycontin.(Tr. 357).

However, on October 12, 2006 Plaintiff reported increased pain over the past two weeks to Dr. Mueller. (Tr. 357). His Lortab was covering breakthrough pain. (Tr. 357). Plaintiff reported minimal tingling in his leg but no weakness. (Tr. 357). Plaintiff's Oxycontin prescription was increased to include 20 mg and 40 mg doses. (Tr. 358). On a follow up on

November 21, 2006, he reported that his pain was better controlled with the increased medication and that he continued to be functional. (Tr. 358).

On February 15, 2007, Plaintiff reported that he was continuing to have pain and tingling down his leg, but no weakness. (Tr. 358). Dr. Mueller again increased his medication, prescribing him only 40mg of Oxycontin, continuing the Lortab prescription, and adding a prescription for oxycodone. (Tr. 358).  On May 15, 2007, Plaintiff reported that his pain was controlled on the current regimen, that he was able to be "more" functional, and that he was experiencing no side effects from the medications. (Tr. 359). However, on August 23, 2007, Plaintiff saw Dr. Mueller and reported numbing in his left leg. (Tr. 359). Dr. Mueller again increased his medication, this time adding Prednisone 20 mg. (Tr. 359).

On September 24, 2007, Plaintiff saw Dr. Mueller. (Tr. 360). He reported that he was still having left back pain and that he could not complete his course of Prednisone because it gave him stomach cramps. (Tr. 360). Dr. Mueller ordered an MRI, considered epidural steroids, and again increased his medication by adding Skelaxin 800 mg to take as needed. (Tr. 360). On October 1, 2007, the MRI revealed minimal anterolisthesis[11] of L5, mild to moderate arthropathy[12] and disc bulging which produced a smaller than normal size of the spinal cord and borderline minimal central spinal stenosis without impingement of the nerve roots, mild spurring, and moderate bilateral foraminal narrowing with at least mild impingement of the nerve roots. (Tr. 354). On December 20, 2007, Plaintiff saw Dr. Mueller and reported pain in his back and into his left leg. (Tr. 360).

---

[11] Anterolisthesis is "vertebral body displacement toward the front." 4-12 Attorneys' Textbook of Medicine (Third Edition) P 12.30
[12] Arthropathy is "[a]ny disease of a joint or of joints." 1-A Attorneys' Dictionary of Medicine A-11164

On January 3, 2008, Plaintiff saw Dr. Wolf for a two and a half year follow-up from his 2005 surgeries. X-rays showed "significant" syndesmophyte formation, although his instrumentation was intact and his fusion was stable. (Tr. 320). He brought an MRI that did not show "much spinal stenosis at all," although it did show degenerative disc disease,  spondylosis, and spondylolisthesis.[13] (Tr. 320). Dr. Wolf also observed "significant ossification of his anterior longitudinal ligament at several levels" and parasthesis. (Tr. 320). Dr. Wolf's notes explain that Plaintiff "did pretty well after the surgery up until about October of 2007. He doesn't remember any specific incident, but he just started getting numbness and tingling in his left leg....His job requires him to sit for prolonged periods of time and sitting is not the best position for him." (Tr. 320). Dr. Wolf ordered a CT scan of the spine to rule out hardware loosening and referred Plaintiff to Susequehanna Valley Pain Management for a pain management reevaluation. (Tr. 320).

On January 3, 2008, the CT scan revealed "[m]ultiple degenerative changes." (Tr. 409). The CT scan showed mild facet arthropathy, minimal and diffuse disc bulge resulting in mild central canal narrowing,  mild and moderate bilateral neural foraminal narrowing, mild to moderate facet hypertrophy and ligamentum flavum hypertrophy with at least mild to moderate central canal stenosis, and posterior decompression at L5-S1.(Tr. 408). Orthopedic screws at L5-S1 precluded the providers from excluding spinal stenosis. (Tr. 408).

On January 9, 2008, Dr. Haueisen completed Plaintiff's pain management reevaluation. (Tr. 283-84). He diagnosed Plaintiff with status post spinal fusion L5-S1, spondylosis, stenosis,

---

[13] Spondylolisthesis is defined as "[a] forward displacement or slipping of one of the bony segments of the spine (i. e., of a vertebra) over its fellow below, but usually the slipping of the fifth or last lumbar (loin) vertebra over the body of the sacrum," or the spinal deformity caused by this displacement. 5-S Attorneys' Dictionary of Medicine S-108668

and left radicular back pain. (Tr. 283-84). He also had an ESI. (Tr. 283-84). Plaintiff reported

pain and discomfort, but no numbing or tingling. (Tr. 283-84). Plaintiff had another ESI on

January 29, 2008 from Dr. Haueisen for "mild/moderate stenosis, leg pain." (Tr. 455).

On February 14, 2008, Plaintiff saw Dr. Mueller. He reported that the increased dose of

medication was working well, had no specific complaints, the ESIs helped, but that physical

therapy was not helping. (Tr. 361). On February 28, 2008, Plaintiff followed up with Dr. Wolf,

who reviewed a CT scan. (Tr. 323). Dr. Wolf observed that Plaintiff's "pain is present with

sitting in one position for a long time, or standing in one position for a long time." Dr. Wolf

ordered a discogram to rule out internal disc disruption. (Tr. 323). The discogram notes indicate

"[c]hronic back pain syndrome characterized by axial back pain with intermittent radiation of

numbness and paresthesias into the left leg."  The discogram report stated that there was "[n]o

conclusive evidence to implicate a diskogenic pain mechanism. Large ridging syndesmophytes

are unusually prominent for a patient of this age and raise the possibility of an enthesopathy[14]

which could also contribute to the patient's pain syndrome." (Tr. 400). The report recommended

serologic testing and lumbar facet joint blocks. (Tr.400).

Plaintiff followed up with Dr. Wolf on May 20, 2008. (Tr. 324). Plaintiff reported that he

continued to have low back pain and left sided radicular pain. (Tr. 324). Dr. Wolf referred him to

a rheumatologist to have him evaluated for DISH syndrome or another rheumatologic problem.

(Tr. 324). Plaintiff requested more ESIs, and Dr. Wolf noted that "[t]he other option is to

consider removal of his instrumentation." On May 28, 2008, Plaintiff saw Dr. Haueisen for

---

[14] Enthesopathy is defined as "[a]ny disorder involving the attachment of muscles or tendons to bone." 2-E Attorneys' Dictionary of Medicine E-40104

another ESI. Dr. Haueisen again diagnosed Plaintiff with spondylosis, stenosis and low back and left radicular pain (Tr. 285-6).  Plaintiff had another ESI on June 18, 2008. (Tr. 452).

On August 18, 2008, Plaintiff had a bone scan of his lumbar spine at the request of his rheumatologist, Dr. Trostle. (Tr. 330, 363,  407). The bone scan revealed "mild degenerative activity secondary to bridging osteophytes in the lower thoracic region and mid/lower lumbar region." (Tr. 407). On September 11, 2008, Plaintiff followed up with Dr. Wolf. (Tr. 330).  X-rays show that his instrumentation is in satisfactory position and seems stable, and again note osteophytes, lateral syndesmophytes and some early ossification of his anterior longitudinal ligament at L4-5. (Tr. 331). Dr. Wolf observed that the bone scans were consistent with Plaintiff's X-rays. (Tr. 330). Dr. Wolf noted that Plaintiff gets some radiation into his left trapezius and that his neck motion showed a slight decreased range of motion. (Tr. 330).  Dr. Wolf diagnosed him with status post posterior spine fusion, degenerative disc disease, lumbar spine, with spondylosis. (Tr. 330). At this point, Plaintiff was taking two Oxycontin 40 mg in the morning, one  in the evening, and one at night, and 15 mg of oxycodone every four hours as needed.

On November 20, 2008, Plaintiff saw Dr. Mueller, who noted that Plaintiff's pain was controlled on his present regimen. (Tr. 363). Plaintiff's medication had again increased, as he was taking 15mg to 30mg of oxycodone every four hours as needed in addition to the same amount of Oxycontin (Tr. 363). Plaintiff had another ESI on December 1, 2008. (Tr. 447). On December 3, 2008, Plaintiff saw Dr. Borror. (Tr. 446, 451). Plaintiff reported that he continued to hunt and fish, and that he had a bruise on his knee from when he fell "hunting the other day."

(Tr. 446). Plaintiff reported that he had been doing well with his low back and that his last ESI seemed to really help. (Tr. 446). He had a normal physical exam. (Tr. 446).

On January 14, 2009, Plaintiff saw Dr. Mueller. (Tr. 363). He reported that he was feeling well without any specific complaint, that he was taking pain medication as directed, and was functional on his regimen. Dr. Mueller had again increased Plaintiff's pain regimen by adding Lovastatin 20mg once per day. (Tr. 364). Plaintiff made the same reports when he saw Dr. Mueller on February 16, March 17, and April 13, 2009 at the same level of pain medication. (Tr. 365-66).

However, on May 7, 2009, Plaintiff reported to Dr. Wolf that, even with pain medication, he was experiencing pain and was no longer able to do the things he used to do. (Tr. 332). Although he was doing better than before his surgeries, he still suffered from "diffuse arthritis in multiple areas of his body and especially in his spine." (Tr. 332). He reported that there was difficulty with ESIs because Plaintiff has spurs in his spine, and that he experienced pain from his back radiating to his leg while working outside pulling weeds and doing things around the house. (Tr. 332). However, Dr. Mueller noted that his medication "keeps him functional" and had a full-time job, and that the plan was "to have him function the best that he can." (Tr. 332). Dr. Wolf also increased his medication by writing a prescription for Celebrex. (Tr. 332). On May 16, 2009, Plaintiff reported to Dr. Mueller that he had been having a lot of pain in his back and legs over the previous two weeks, along with a tingling left leg. Plaintiff's extremity strength and gait were normal. (Tr. 366).

On June 15, 2009, Plaintiff reported to Dr. Mueller that the increased dose of medications had calmed his pain and that he was more functional. (Tr. 367). On July 14, August 14,

September 12, October 1, October 12, and November 11, 2009, he reported to Dr. Mueller that he was feeling well without complaints and was functional on his pain medication regimen. (Tr. 367-70). At this point, Plaintiff's medications had increased to Oxycontin 80 mg, instead of 40 mg. He also remained on Lovastatin. (Tr. 367, 368, 369, 370). However, by December 11, 2009, Plaintiff was reporting tingling in his leg after sitting for a long period of time. (Tr. 370).

On January 9, 2010, Plaintiff reported to Dr. Mueller that he was functional on the same doses of medication. (Tr. 370). However, on February 8, 2010, Plaintiff reported to Dr. Mueller that he had run out of medication one day early. (Tr. 371). He admitted taking more than prescribed after shoveling and reported muscle spasms and paresthesis down his left leg. (Tr. 371). Plaintiff's gait, reflexes, and strength were normal, but had a positive straight leg raise test. (Tr. 371). Dr. Mueller increased his medication by prescribing him Pamelor, Gabapentin, and Soma tablets, along with the oxycodone, Oxycontin, and Lovastatin. (Tr. 371). On February 9, March 11, April 10, and May 10, 2010, Plaintiff reported that his pain flare ups had improved, that he was more functional and could do laundry and work around the house, denied parasthesia or weakness, had normal gait, strength, and reflexes, and negative straight leg tests. (Tr. 371, 372, 373).   On July 8, 2010, August 7, 2010, September 7, 2010, and October 7, 2010, Plaintiff reported to either Dr. Mueller or Shanga Shahswar, a nurse in Dr. Mueller's office, that he was much more functional, can care for his children, perform household chores, hold a full-time job, and go shopping. (Tr. 341, 384, 386, 391). Dr. Mueller and Shahswar observed that Plaintiff could walk to the examination room without assistance and sit comfortably. (Tr. 341, 384, 386, 391).

However, by November 6, 2010, Plaintiff reported that the Oxycontin was no longer working as well. (Tr. 388-89). Dr. Mueller decided that they needed to try to decrease Plaintiff's total dose down to 200 mg per day of Oxycontin and increase his Gababentin. Dr. Mueller also referred Plaintiff for further treatment by a pain management specialist and psychologist. (Tr. 389). On December 1, 2010, Plaintiff was evaluated at the Chronic Pain Clinic at Hershey Medical Center. (Tr. 483). Plaintiff reported chronic low back pain that was constant and throbbing, originating in the left lower back and radiating down Plaintiff's left leg, sometimes to his toes. (Tr. 483). Plaintiff reported that his pain was never better than 4/10. (Tr. 483). Plaintiff reported that he experienced numbness in his left leg and that sitting for an extended period of time, housework, and lawn work exacerbates his pain. (Tr. 483). He explained that he had tried many previous therapies, including physical therapies, multiple medications, nerve blocks, and injections, without success. (Tr. 483). He reported that his pain disturbs his sleep and that his activities had decreased as a result of pain. (Tr. 484). Plaintiff denied increased sedation due to medications. (Tr. 483).

Plaintiff had a normal gait, strength, and reflexes. He had a positive facet loading test on the left. The pain specialist noted chronic opiod use and recommended a pain psychologist, although she noted that would be "difficult to do with employment." (Tr. 484). The pain specialist also noted that Plaintiff was "taking relatively high dose opiods…did discuss some of the problems that can result by taking increased doses of chronic narcotic medication, and did encourage patient to either remain on the dose of medication that he is currently on or to decrease the medication if tolerated." (Tr. 484).

On January 5, 2011, Plaintiff reported to Dr. Mueller's office that he was much more functional, can care for his children, perform household chores, hold a full-time job, and go shopping on his pain regimen. He had similar reports on February 5 and March 7, 2011, although he had a positive straight leg raising test on February 5, 2011. (Tr. 374, 378, 380).

On April 6, 2011, Plaintiff saw Dr. Mueller. (Tr. 430). By then, Plaintiff had been fired from his job. (Tr. 430). He had positive straight leg raising and patellar jerk of 2/4 on the left. When Plaintiff lost his job, he also lost his insurance. Dr. Mueller noted that "although it is not ideal pain management will just keep him on short acting medicine due to expense." (Tr. 430). By May 6, 2011, Plaintiff could no longer afford Oxycontin. (Tr. 429). However, he reported that he was still more functional on medications, could walk to the examination room by himself, and sit for an undetermined length of time. (Tr. 429). Plaintiff had similar reports in visits to Dr. Mueller's office on June 1, 2011, June 4, 2011, and July 2, 2011. (Tr. 424, 426, 428, 429).

By August 3, 2011, Plaintiff was no longer able to afford any of his medications other than Lovastatin and oxycodone. (Tr. 422). Plaintiff reported numbness and tingling. (Tr. 422). He had a positive straight leg raise test. (Tr. 422). Dr. Mueller explained that Plaintiff "has difficulty functioning without medication, cannot lift off of med more than 25 lb, long car rides cause pain patient has to stop, so prolonged sitting is a problem. Getting numbness in his left leg. Certain activities aggravate pain such as cutting grass and doing yard work, med helps allow him to do activities." (Tr. 422). Plaintiff saw Shanga Shahswar on September 2, 2011, and October 1, 2011, and November 30, 2011, who repeated her observation from June 2011 that Plaintiff was more functional on his medications. (Tr. 414, 418, 420). However, the next time Plaintiff saw Dr. Mueller, on October 31, 2011, he again noted the "difficulty" Plaintiff was having

without his medications.  Dr. Mueller also observed worsening ankle jerk of 2/4 on the right and

0/4 on the left. (Tr. 416). Dr. Mueller perfunctorily noted that Plaintiff was more functional on

his medication on December 30, 2011. (Tr. 412).

On January 30, 2012, Dr. Mueller provided Plaintiff's counsel with an opinion regarding

Plaintiff's pain and functioning. (Tr. 514-15). Dr. Mueller opined that Plaintiff had a disorder of

the spine, neuroanatomic distribution of pain, limitation of motion of spine, sensory or reflex

loss, positive straight leg raising tests, a need to change position or posture more than once every

two hours, lumbar spinal stenosis, chronic nonradicular pain and weakness, and an inability to

ambulate effectively. (Tr. 514-15). He opined that Plaintiff suffered from "extreme" pain, could

not sit or stand still more than fifteen minutes, and has to constantly keep moving to deal with his

pain, although he could do some activities of daily living such as shopping and doing things

around the house.

## 2.   Wrist and Carpal Tunnel

In June, 2006, Plaintiff injured his wrist in the shower. (Tr. 319). An MRI of the wrist on

June 6, 2006, showed a few small areas of sclerosis but no acute right wrist abnormality. (Tr.

411).  A report from August 11, 2006, from Heritage Diagnostic Center confirmed that the there

might be a "subtle bone bruise, [but] no other abnormality of right wrist." (Tr. 410). On

December 1, 2006, Plaintiff saw Dr. Wolf for treatment of right wrist pain. Plaintiff reported that

this pain began with an injury in the shower and had not resolved. X-rays revealed no fracture,

(Tr. 318), so Dr. Wolf prescribed injections with a plan to reevaluate if the injections failed to

control his pain. (Tr. 319).

About two years later, on May 23, 2008, he reported numbness in hands to Dr. Borror. (Tr. 454). Nerve conduction studies were consistent with severe carpal tunnel syndrome in the right and moderate carpal tunnel in the left. (Tr. 435). Dr. Wolf noted that Plaintiff is a good historian, and planned for a right carpal tunnel release followed by a left carpal tunnel release one month later. (Tr. 325). Dr. Stephen Daily performed the right carpal tunnel release on July 14, 2008, which Plaintiff tolerated well, and the left carpal tunnel release on August 14, 2008, which Plaintiff also tolerated well. (Tr. 403-406). Post-operation, Plaintiff reported improvement of his symptoms and had no complaints. (Tr. 327, 329). Plaintiff did not identify wrist pain or wrist problems in any subsequent medical visits or in his application for disability benefits.

### b.  ALJ Findings

The ALJ found that Plaintiff is insured through December 31, 2015. (Tr. 19, Finding 1). The ALJ found that Plaintiff has not engaged in substantial gainful activity ("SGA") since the alleged onset date of March 16, 2011. (Tr. 19, Finding 2). The ALJ found that Plaintiff suffered from three severe impairments: status post low back fusion, degenerative disc disease, and left neuropathy. (Tr. 19, Finding 3). The ALJ analyzed Plaintiff's bilateral carpal tunnel and found that while it was medically determinable, it was not severe because Plaintiff was able to work with his hands as an electronics technician and never reported problems with carpal tunnel to Dr. Mueller, his pain specialist. (Tr. 19, Finding 3). As a result, the bilateral carpal tunnel did not result in more than a minimal degree of limitation in his ability to perform basic work tasks.

The ALJ found that Plaintiff does not have an impairment or combination of impairments that meet a Listing. The entirety of the ALJ's Listing analysis states:

> There is no indication that the claimant's physical impairments are associated with sufficient findings to meet any relevant section of Listing 1.00 (Muscuoskeletal System),

2.00 (Special Senses and Speech), 3.00 (Respiratory System), 4.00 (Cardiovascular
System), 5.00 (Digestive System), 6.00 (Genito-Urinary System), 7.00 (Hemic and
Lymphatic System), 8.00 (Skin), 9.00 (Endocrine System), 11.00 (Neurological), 13.00
(Neoplastic Diseases, Malignant), or 14.00 (Immune System).

(Tr. 20, Finding 4).

The ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform

sedentary work, except that he requires sitting and standing at will, should avoid operating foot

controls and ladders, and could only occasionally climb stairs, balance, stoop, kneel, crouch, and

crawl. (Tr. 20, Finding 5). The ALJ rejected Plaintiff's testimony that his pain limits him from

sitting or standing still for more than fifteen minutes because: (1) the December 1, 2010 pain

management report showed that he walked with a normal gait, exhibited normal strength in his

extremities, and had "intact sensation and tenderness" in his left lumbar facet joints; (2) progress

notes from Dr. Mueller between March and October of 2011 showed that Plaintiff was in "no

acute distress," could walk to the examination room on his own, could sit comfortably on the

examination table, and was "more functional" in activities of daily living while he was on

medication; (3) a January 2008 CT scan showed mostly normal examination findings; and (4)

Plaintiff testified that he could engage in various activities of daily living like hunting and

fishing once a year, follow instructions, mow his lawn, and drive and go out of his house. (Tr.

21, Finding 5). The ALJ rejected Dr. Mueller's opinion that Plaintiff's pain limits him from

sitting or standing for more than fifteen minutes because his opinion was purportedly

inconsistent with his treatment notes that Plaintiff could engage in activities of daily living, that

Plaintiff was more functional on medication, that Plaintiff presented in no acute distress, his

"very limited examination findings" and because "Dr. Mueller did not feel that additional

treatment or medication was necessary."  The ALJ also found Dr. Mueller's assessment to be

inconsistent with other evidence in the record, namely Plaintiff's reported improvement with medication and his ability to do activities like yard work.

The ALJ found that Plaintiff could not engage in his past relevant work (Tr. 22, Finding 6), but that Plaintiff could engage in a range of sedentary work, as identified by the vocational expert, that exists in the national economy (Tr. 22, Finding 10). As a result, the ALJ concluded that Plaintiff is not disabled. (Tr. 23, Finding 11).

## VI.     Plaintiff Allegations of Error

### a.     The ALJ's failure to evaluate all of Plaintiff's medically determinable impairments

Plaintiff alleges that the ALJ failed to acknowledge  "a number of medically determinable lumbar and thoracic spine impairments with radiculopathy in his left lower extremity,"  (Pl. Brief at 12, Doc. 11), specifically "lumbar spinal stenosis, left lower extremity radiculopathy, ossification of the anterior longitudinal ligament at L4-5, spondylosis, DISH syndrome, or degenerative disease [of] the thoracic spine." (Id at 14). Plaintiff alleges he was harmed at step 3 in the sequential process because the ALJ is required to evaluate whether all impairments, in combination, meet or equal a listing. (Pl. Brief at 15-16) (citing 20 C.F.R. §§404.1525-.1526, 416.925-.926). Plaintiff alleges he was harmed by these omissions in the residual functional capacity analysis because "the ALJ cannot appreciate limitations a condition causes if the ALJ does not even recognize the condition exists." (Pl. Brief at 15). Plaintiff alleges he was harmed by these omissions in the ALJ's credibility findings because they would have substantiated his claims regarding the persistence and intensity of his symptoms. (Pl. Brief at 15) (citing 994 F 2d at 1068). Plaintiff alleges that the ALJ should have found his bilateral carpal tunnel syndrome to be severe. (Pl. Brief at 16). Plaintiff also alleges that the ALJ should have

acknowledged and evaluated his diagnoses for pericarditis, hyperlipidemia, Reiter's syndrome, plantar fasciitis, joint athralgias, osteopoikilosis, and Vitamin D deficiency. (Pl. Brief at 16).

In response, Defendant implicitly agrees that the ALJ failed to acknowledge or evaluate Plaintiff's other diagnoses, but argues that because Plaintiff has failed to identify "functional limitations these conditions caused beyond those found by the ALJ in his RFC assessment," Plaintiff "has not met his burden of proving they were 'severe' impairments." (Def. Brief at 10-11, Doc 12). Defendant further asserts that even if the ALJ erred "in not finding that some of Plaintiff's other diagnoses were 'severe,'" this error was harmless. (Def. Brief at 11). Defendant argues that Plaintiff bears the burden of proving the ALJ's error was harmful, and cannot do so here because the "ALJ did not deny benefits at step two of the sequential evaluation process." (Def. Brief at 11). The Defendant further asserts that "the ALJ's precise step-two findings were immaterial to his ultimate finding of non-disability." Defendant alleges that the ALJ's hypothetical to the vocational expert accounted for all of Plaintiff's limitations, and "accounted for Plaintiff's difficulty with standing/standing for prolonged periods of time by limiting him to jobs that provided a sit/stand option at will." (Def. Brief at 14).

Plaintiff replies that Defendant mischaracterizes the ALJ's decision. Plaintiff explains that the ALJ made no "finding" regarding the severity of Plaintiff's additional, unacknowledged impairments, and that Plaintiff is not challenging a finding of severity. Instead, Plaintiff is challenging the ALJ's failure to find these impairments to be "medically determinable." (Pl. Reply Brief at 1, Doc. 13).

The Court finds that the ALJ's determination that Plaintiff's bilateral carpal tunnel is not severe is supported by substantial evidence. Plaintiff did not identify carpal tunnel to his pain

specialist, Dr. Mueller. Plaintiff did not claim that he was unable to work as a result of his carpal

tunnel in his initial application, in his request for a hearing before the ALJ, or in his request for

review to the Appeals Council. Plaintiff testified that he was able to work as an electronics

technician and was fired because he had to move around constantly to deal with pain in his back

and lower extremities. He did not testify to any problems at his job resulting from carpal tunnel.

However, the Court finds that the ALJ made no mention of Plaintiff's other diagnoses.

Thus, the Court cannot adopt the Defendant's interpretation of the ruling that the ALJ somehow

made a "severity" finding. The ALJ made no finding whatsoever with regard to these

impairments. If the ALJ did consider these diagnoses, and found them to be either not medically

determinable or not severe, it is not apparent from the record.  This is particularly important in

this case because lumbar spinal stenosis may be considered under Listing 1.04(C), but

degenerative disc disease, neuropathy, and status post low back fusion may not be considered

under Listing 1.04(C) in the absence of lumbar spinal stenosis. Listing 1.04(C) mandates a

finding of disability where claimant has "[l]umbar spinal stenosis resulting in

pseudoclaudication,[15] established by findings on appropriate medically acceptable imaging,

manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate

effectively, as defined in 1.00B2b."

An ALJ's failure to identify lumbar spinal stenosis does not automatically require

remand. If a Plaintiff fails to produce evidence of remaining requirements in Listing 1.04(C), an

---

[15] Pseudoclaudication refers to cramp like pains in the legs caused by compression of the nerves. 1-C Attorneys'
Dictionary of Medicine C-21420; 3-I Attorneys' Dictionary of Medicine I-61477; 4-P Attorneys' Dictionary of
Medicine P-96664. Listing 1.00(K)(3) explains that "Pseudoclaudication… may result from lumbar spinal stenosis,
is manifested as pain and weakness, and may impair ambulation. Symptoms are usually bilateral, in the low back,
buttocks, or thighs, although some individuals may experience only leg pain and, in a few cases, the leg pain may be
unilateral."

ALJ will have had substantial evidence to conclude that Listing 1.04(C) does not apply. Seaman v. Soc. Sec. Admin., 321 F. App'x 134, 136 (3d Cir. 2009). Here, however, Plaintiff produced evidence of each of the other criteria. Inability to ambulate effectively includes "the inability to walk a block at a reasonable pace on rough or uneven surfaces." Listing 1.00(B)(2)(b)(2). Plaintiff testified that he could only walk a half a block before the pain and tingling in his legs forced him to stop. As discussed above, Plaintiff produced ample evidence of pain and weakness in his legs and lower buttocks that could support a finding of pseudoclaudication manifested by chronic nonradicular pain and weakness. The ALJ does not have to credit this evidence and is not required to find that Plaintiff's impairment meets or equals a listing. However, the ALJ's failure to identify lumbar spinal stenosis as a medically determinable impairment, combined with the ALJ's failure to address any of the other criteria in the listing, preclude the Court from engaging in meaningful review of the step 3 analysis.

The ALJ also failed to discuss Plaintiff's other impairments or the physical abnormalities that resulted from these impairments. Plaintiff produced objective medical evidence from a variety of medically acceptable imaging techniques that show physical abnormalities that become more severe over time. X-rays from March 4, 2003 and January 3, 2008 demonstrate spondylitis, which is inflammation of the vertebrae. (Tr. 293, 320). X-rays from March 4, 2003 and a CT scan from January 3, 2008 show facet joint disease that is "mild" to "moderate" by January of 2008. (Tr. 293, 408-09). X-rays from March 4, 2003, July 2003, November 23, 2004, and January 3, 2008, MRIs from April 6, 2004 and November 24, 2004, a discogram from May 27, 2004 and a bone scan from August 18, 2008 show degeneration or degenerative disc disease, initially at L5-S1 and eventually spreading throughout, and an MRI from January 16, 2004

showed mild degenerative end place signal change at L5-S1. (Tr. 228-29, 292, 299-300, 303, 306-07, 320, 407).

X-rays from March 4, 2003 and November 23, 2004 and an MRI from October 1, 2007 show collapse and spurs, which are small, pointed outgrowths, usually of bone, initially at L4-5 and then indicated throughout (Tr. 293, 306, 354). An MRI from March 4, 2003 noted an asymmetric osteophyte, which is an outgrowths of tissue from a bone, at the left. (Tr. 293). A May 27, 2004 discogram showed osteophytes at L4-5, and an August 18, 2008 bone scan showed that the osteophytes had spread to the lower thoracic region and mid/lower lumbar region. (Tr. 407). An X-ray from September 11, 2008 also noted the presence of osteophytes. (Tr. 331). An X-ray from July, 2003 identified anterior syndesmophytes, which are outgrowths of bone from a ligament, at L2-3, L3-4, and L4-5. (Tr. 299-300). X-rays on January 8, 2004 and March 9, 2006 identified lateral syndesmophytes at L3-4. (Tr. 317). On an X-ray from  January 3, 2008, the syndesmophyte formation was noted to be "significant" (Tr. 320), and the X-ray from September 11, 2008 noted lateral syndesmopthytes throughout. (Tr. 331). X-rays from March 4, 2003, January 8, 2004, March 9, 2006, January 3, 2008 and September 11, 2008 show ossification, which is the abnormal conversion of soft tissue into bone, of the anterior longitudinal ligament in several areas. (Tr. 293, 302, 317, 320, 331).  The ossification was initially noted to be mild but was "significant" by January of 2008.

MRIs from January 16, 2004 and April 6, 2004 showed that Plaintiff's L5 and S1 nerve roots were conjoined, with is a congenital defect. (Tr. 228-29, 303). MRIs from March 4, 2003, March 11, 2003, October 1, 2007 and a CT scan from January 3, 2008 show foraminal narrowing and spinal stenosis, which are narrowing of the spinal canal or the space through which the

spinal cord flows. (Tr. 293, 354). The spinal stenosis and foraminal narrowing were mild in

March 2003 but were moderate with at least a mild impingement on nerve roots by October

2007. In March 2003, an MRI indicated that Plaintiff had no significant canal stenosis. (Tr. 294).

In October 2007, Plaintiff had borderline minimal canal stenosis without impingement on the

nerve root. (Tr. 354). By January 2008, Plaintiff had mild central canal narrowing and mild to

moderate central canal stenosis. (Tr. 408-09). MRIs on January 16, 2004 and November 24, 2004

and a discogram from May 27, 2004, showed a hemilaminectomy defect and epidural fibrosis, or

scarring, and granulation tissue on the left at L5. (Tr. 228-29, 307). The discogram from May

2004 noted that this scarring was affecting the nerve root. MRIs from March 4, 2003 and January

16, 2004, and a CT scan from January 3, 2008, identified disc bulges, which were initially mild

but were diffuse by January of 2008.  (Tr. 228-29, 293, 408-09).  An MRI from October 1, 2007

and an X-ray from January 3, 2008 show spondylolisthesis and anteriolisthesis, which are

vertebral displacement to the front or forward slipping of vertebrae. (Tr. 320, 354). Various

MRIs, X-rays, and CT scans show disc space narrowing, Schmorl nodes, parasthesis, and

posterior decompression. (Tr. 228-29, 320, 408-09).

Of these physical abnormalities, the ALJ identified only degenerative disc disease. He did

not discuss Plaintiff's other impairments or diagnoses. This Court cannot guess whether the ALJ

considered Plaintiff's other alleged impairments, including lumbar spinal stenosis, and found

them to be not medically determinable at step two. If these impairments are medically

determinable, then they have to be considered at step three, in weighing medical opinion

evidence and Plaintiff's credibility for the RFC analysis, and in applying the RFC at steps four

and five. These additional impairments would impact the RFC analysis because various

providers believed that they were the cause of Plaintiff's discomfort. For instance, Dr. Wolf noted that the scarring at L5-S1 was affecting the S1 nerve root, which was causing Plaintiff's discomfort. (Tr. 304). Radiology reports noted "[l]arge ridging syndesmophytes are unusually prominent for a patient of this age and raise the possibility of an enthesopathy  which could also contribute to the patient's pain syndrome." (Tr. 400). Thus, remand is necessary for the ALJ to develop the record with sufficient detail so that this Court can engage in meaningful review of Plaintiff's medically determinable impairments and how they impact the ALJ's analysis at subsequent steps.

> **b.   The ALJ's rejection of Dr. Mueller's opinion and Plaintiff's testimony that he cannot remain in one position without moving around for more than fifteen minutes**

Dr. Mueller opined that Plaintiff cannot sit or stand still for more than fifteen minutes and has to be constantly moving around.  However, the ALJ rejected this opinion and assigned it "little weight." Plaintiff alleges that the ALJ erred in assigning little weight to Dr. Mueller's opinion because, as Plaintiff's treating physician, his opinion should be afforded great weight. Plaintiff asserts that the ALJ failed to acknowledge or evaluate medical records that were inconsistent with his conclusion. (Pl. Brief at 19).  Plaintiff also asserts that the ALJ improperly substituted his own judgment for that of Dr. Mueller because there was no medical opinion evidence that contradicted his report. (Pl. Brief at 20).

Defendant responds that an ALJ may properly discredit the findings of a treating physician where they are inconsistent with those physician's own previous findings, and that Dr. Mueller's report was inconsistent with his previous findings in this case. (Def. Brief at 20). Specifically, Defendant asserts that in these records, Dr. Mueller found that Plaintiff was able to walk to the examination room without assistance, sit comfortably on the examination table

without difficulty or evidence of pain, was "more functional" on his medications, could perform household chores, drive, walk his dog, work in his garden, and go shopping.

The Court finds that none of these reports are inconsistent with Dr. Mueller's January, 2012 opinion that Plaintiff could not sit or stand still for more than fifteen minutes.  First, the January 2012 report is not inconsistent with treatment notes documenting Plaintiff's daily acitivities or Plaintiff's testimony regarding Plaintiff's activities because the report identifies the same daily activities. Thus, Plaintiff's activities cannot be used an internal inconsistency to dismiss Dr. Mueller's opinion.

Second, the ALJ's conclusions that Plaintiff's condition had improved in August of 2011 with medication, that Plaintiff's symptoms are adequately controlled by with medication, and that Dr. Mueller did not believe additional treatment was necessary is not supported by substantial record evidence. Plaintiff was unable to stay at a particular level of pain medicine for more than a few months before experiencing breakthrough pain and end dose failure, and was referred to pain specialists and pain psychologists. Moreover, Plaintiff can no longer afford his medications after his alleged onset date and suffered an observable decline once he was no longer able to take the same high dose of opiods.

In 2002, Plaintiff was managing his pain with epidural steroid injections every few weeks, but reported in early 2003 that they were not controlling his pain. (Tr. 279, 290). Plaintiff was referred to Dr. Wolf for evaluation of his pain symptoms and treatment. (Tr. 290). Dr. Wolf prescribed physical therapy, Vicodin, and Motrin, but when "conservative treatment" failed to control the pain, he recommended and performed a hemilaminectomy/discectomy. (Tr. 295). After the surgery, Plaintiff was prescribed only physical therapy, but reported in early 2004 that

he needed several hydrocodone just to get through the day; consequently Dr. Wolf increased his

pain medication regimen by adding Prednisone. (Tr. 301-02).   In April 2004, Plaintiff was also

using Lortab sparingly (Tr. 303), but by May 27, 2004, he was taking two to three Lortab per day

(Tr. 304), and by June 23, 2005, he was taking six Lortab per day (Tr. 312).

     In September 2005, Dr. Wolf referred Plaintiff to Dr. Mueller for "chronic pain

management" (Tr. 355). Dr. Mueller prescribed him 20mgs of Oxycontin, two to three times per

day. (Tr. 314). By January of 2006, Plaintiff was experiencing end dose failure with Oxycontin,

(Tr. 356), and by October 12, 2006, breakthrough pain required that Dr. Mueller increase

Plaintiff's dose of Oxycontin to 20 or 40 mg two to three times per day.  (Tr. 357). Plaintiff did

well until he experienced pain and tingling despite his medications in February 2007, when Dr.

Mueller increased Plaintiff's dose of Oxycontin to 40 mg and added Lortab and oxycodone. (Tr.

358). By August 2007, Plaintiff was experiencing numbing, despite his pain medication, and Dr.

Mueller increased his pain regimen by adding Prednisone 20 mg. (Tr. 359). Plaintiff was still

experiencing pain, so the next month, Dr. Mueller again increased Plaintiff's pain regimen by

adding 800 mg of Skelaxin. (Tr. 360). He also referred Plaintiff to Susquehanna Valley Pain

Management for a pain management reevaluation. (Tr. 320). By September 2008, Plaintiff was

up to four Oxycontin 40mg per day and 15mg of oxycodone every four hours as needed, which

was increased in November of 2008 to 30mg mg of oxycodone every four hours as needed and in

January of 2009 to add Lovastatin 20mg once per day. (Tr. 330, 363). Plaintiff did well on that

regimen until May of 2009, when he reported that he was still having pain despite his

medications, so Dr. Mueller increased his regimen to include Celebrex. (Tr. 332).   In July of

2009, Plaintiff's Oxycontin was increased from 40mg to 80mg. (Tr. 367-70). Plaintiff did well

on that regimen until December of 2009, when he reported that he had a tingling leg despite the medication. (Tr. 370). In February of 2010, Plaintiff's medication was insufficient to handle shoveling snow, so he took more than prescribed and ran out early. Dr. Mueller responded by increasing his regimen by adding three new medications: Pamelor, Gabapentin, and Soma. (Tr. 371). By November of 2010, Plaintiff's Oxycontin was no longer working as well, and Dr. Mueller wanted him to cut down to approximately 200 mg per day and increase his Gabapentin if tolerated. (Tr. 388-89). Dr. Mueller also referred Plaintiff to a pain management specialist and a pain psychologist. (Tr. 388-89). The chronic pain specialist noted Plaintiff's chronic opiod use, identified the "problems" that are associated with the use of such "high dose opioids," and recommended that Plaintiff lower his dosage and see a pain psychologist, although the specialist acknowledged this would be difficult given Plaintiff's employment at the time. (Tr. 483).

Plaintiff improved on his pain medication throughout the spring of 2011. However, by April 2011, Plaintiff had lost his job and lost his insurance. Dr. Mueller was forced to keep Plaintiff on short-acting medications due to the expense of other therapies, but noted it was not ideal. Dr. Mueller reported that Plaintiff could no longer afford Oxycontin. (Tr. 429-430). In reports from August through December of 2011, Plaintiff was no longer able to use Oxycontin. Dr. Mueller's note from August 3, 2011, states that Plaintiff "has difficulty functioning without medication, cannot lift off of med more than 25lb, long car rides cause pain patient has to stop, so prolonged sitting is a problem. He is getting numbness in left leg. Certain activities aggravate pain such as cutting grass and doing yard work, med helps allow him to do activities." (Tr. 422). Dr. Mueller indicated similar findings on October 31, 2011, but also noted positive straight leg raising test, ankle jerk of 2/4 on the right side, and ankle jerk of 0/4 on the left side. (Tr. 416).

The ALJ cannot conclude that Plaintiff's pain is properly managed by medications he can no longer afford, particularly when Dr. Mueller's treatment notes repeatedly indicate that he needs these medications in order to function.  Plaintiff suffered a noticeable decline with significant examination findings once he was unable to afford his medications.

Dr. Mueller's observation that Plaintiff presented in no acute distress is not inconsistent with his report that Plaintiff suffers from "extreme" pain. "Acute" and "extreme" are not synonyms. "Acute" is used to distinguish the onset and course of a disease from a "chronic" disease.  1-A Attorneys' Dictionary of Medicine A-2153. Moreover, his report states that Plaintiff experiences pain after sitting or standing still for more than fifteen minutes. There is no indication that Plaintiff was required to sit or stand still for more than fifteen minutes during his exams. Observing that Plaintiff was in no acute distress during these exams is not inconsistent with Dr. Mueller's report that Plaintiff suffers extreme pain after sitting or standing still for more than fifteen minutes and cannot be used as a basis for rejecting Dr. Mueller's report.

Dr. Mueller's observations that Plaintiff could walk to the examination room and sit comfortably are not inconsistent with his report for the same reason: there is no indication that those examinations required Plaintiff to stand still or sit for more than fifteen minutes. Similarly, Dr. Mueller's treatment notes that Plaintiff can drive a car without being distracted by pain do not contradict Dr. Mueller's opinion that Plaintiff cannot sit for more than fifteen minutes because there is no indication that Plaintiff was driving for more than fifteen minutes. Plaintiff testified that he was able to drive for fifty minutes without pain when he was able to afford

Oxycontin, but that says nothing about his ability to drive without Oxycontin.[16] Moreover, the December 1, 2010 pain management report that indicated Plaintiff walked with a normal gait, had normal gait, and had "intact sensation and tenderness" does not contradict Dr. Mueller's opinion that sitting or standing for more than fifteen minutes causes Plaintiff extreme pain. Plaintiff's gait is simply not related to whether he experiences pain while sitting or standing in one position.

The January 3, 2008 CT scan similarly does not contradict Dr. Mueller's opinion. First, the ALJ does not explain how the CT scan relates to Plaintiff's ability to stand or sit. Second, the ALJ fails to acknowledge the X-rays, MRIs, CT scans, bone scans, and discograms described above that demonstrate inflammation of the vertebrae, moderate facet joint disease, progressively worsening degenerative disc disease, collapse, spurs, osteophytes that spread from L4-5 to the lower thoracic region and mid/lower lumbar region, granulation tissue, vertebral displacement, disc space narrowing, Schmorl nodes, parasthesis, posterior decompression, conjoined nerve roots, moderate spinal stenosis and foraminal narrowing with at least a mild impingement on the nerve roots, scarring that impacted the nerve roots, "significant" syndesmophytes, and "significant" ossification.

The weight of the evidence also supports Dr. Mueller's conclusions. (Tr. 294) (Dr. Wolf observed that Plaintiff "has a difficult time sitting for any length of time, he can't stand in one position for a long time and he has a difficult time walking"); (Tr. 300) (Dr. Wolf observed, two months after Plaintiff's 2003 surgery, that he had pain on extended sitting); (Tr. 303) (In April

---

[16] Even if Plaintiff's testimony established that he could sit still for up to fifty minutes without having to walk away from his work station, remand would still be necessary. The ALJ did not include any limitation in his hypothetical to the vocational expert to account for Plaintiff's need to move around after fifty minutes. Thus, the ALJ would not have substantial evidence for his finding that Plaintiff could perform work in the national economy.

2004, Dr. Wolf observes that Plaintiff's "sitting tolerance is not great….he can't stand in one position for a long time."); (Tr. 320) (In January 2008, Dr. Wolf observes that "sitting is not the best position for him"); (Tr. 323) (In February, 2008, Dr. Wolf observes that "pain is present with sitting in one position for a long time, or standing in one position for a long time."); (Tr. 370) (In December, 2009, Dr. Mueller's notes indicate tingling in Plaintiff's leg after sitting for a long period of time); (Tr. 483) (Notes from the Chronic Pain Clinic at Hershey Medical Center indicate that Plaintiff's pain is worse after sitting for an extended period of time); (Tr. 422) (In August 3, 2011, when Plaintiff could no longer afford Oxycontin, Dr. Mueller notes that "prolonged sitting is a problem."). Moreover, Plaintiff was fired from his job because he was unable to stop moving or stand or sit still for more than fifteen minutes.

The ALJ failed to acknowledge or evaluate any of the above-described evidence that contradicted his determination. The ALJ also failed to acknowledge or evaluate any of the other factors to be considered in rejecting the opinion of a treating physician. Dr. Mueller treated Plaintiff multiple times a year for almost seven years before the ALJ issued his determination. Dr. Mueller is a pain specialist. No other opinion evidence contradicts Dr. Mueller's report. Thus, remand is necessary for the Commissioner to properly weigh Dr. Mueller's report, particularly his opinion that Plaintiff cannot sit or stand still for more than fifteen minutes. If the report is discounted, the Commissioner must give specific, legitimate reasons based upon substantial record evidence.

### c.   The ALJ erred in finding Plaintiff to be not credible

Plaintiff alleges that ALJ erred in its finding that Plaintiff's testimony regarding the intensity, persistence, and limiting effects of the symptoms was not credible. Plaintiff argues that

the ALJ failed to acknowledge objective medical evidence that substantiated his testimony or his exemplary work history. (Pl. Brief at 17-18).

Defendant responds that substantial evidence supports the ALJ's finding that Plaintiff's testimony was not credible. (Def. Brief at 14). Defendant asserts that Plaintiff's testimony alone is "never sufficient to establish an impairment." (Def. Brief at 14) (citing 20 C.F.R. §§ 404.1528(a), 416.928(a)). Defendant explains that the ALJ is not required to credit Plaintiff's testimony, and that the ALJ properly rejected Plaintiff's testimony because it was inconsistent with objective medical evidence and Plaintiff's reports of his activities of daily living. (Def. Brief at 15). Defendant asserts that the ALJ's failure to mention Plaintiff's long work history does not require a remand and that even if the ALJ considered Plaintiff's long work history, substantial evidence would still have supported his credibility determination (Def. Brief at 16).

The Court finds that the ALJ erred in finding Plaintiff to be "not credible." As discussed above, nothing in the record contradicts Plaintiff's testimony that he cannot sit or stand still for more than fifteen minutes and that he has to move constantly to avoid extreme pain.  Moreover, Plaintiff's subjective complaints "must be considered with the objective medical abnormalities." SSR 96-4p. Plaintiff produced evidence from a variety of medical imaging sources that showed multiple, deteriorating objective medical abnormalities. The ALJ failed to acknowledge most of these abnormalities. The ALJ's partial citation to the January 3, 2008 CT scan is insufficient to satisfy his obligation to consider Plaintiff's complaints with objective medical abnormalities where he ignored a plethora of other radiology reports in the form of MRIs, CT scans, X-rays, discograms, and bone scans, including more recent radiology reports. The ALJ is required to explain why he rejected this contradictory, objective medical evidence.

However, although Plaintiff testified that he experienced side effects from his medication, the ALJ properly discredited this testimony on the grounds that Plaintiff had consistently denied side effects from medication over the course of several years. Cf. Burns v. Barnhart, 312 F.3d 113, 130-31 (3d Cir. 2002) (rejecting claimants testimony regarding the side effects of his medication where the record "contained 'no significant complaints of side effects from medication'" and explaining that "[d]rowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations.").

The ALJ's flawed credibility finding is not harmless error, because if Plaintiff's testimony that he cannot sit or stand still for more than fifteen minutes is credited, the testimony of the vocational expert establishes that no competitive work in the national economy exists and Plaintiff will be found to be disabled. Remand is necessary for the Commissioner to properly weigh the credibility of Plaintiff's testimony, particularly regarding his inability to sit or stand still for more than fifteen minutes and his need to move around. If the testimony is discounted, the Commissioner must give specific, legitimate reasons based upon substantial record evidence

## VII.    Recommendation

The Court finds that the ALJ improperly failed to evaluate or acknowledge all of Plaintiff's medically determinable impairments, which resulted in a flawed analysis at step three of the sequential analysis and in determining Plaintiff's RFC. As a result of this error, the Court cannot determine based on the record before it whether substantial evidence supported the ALJ's findings at steps three and five. The Court further finds that the ALJ improperly discounted the Dr. Mueller's opinion and Plaintiff's testimony that he has to move around every fifteen minutes

to avoid extreme pain. None of the evidence identified by the ALJ contradicts the report or Plaintiff's testimony.

Accordingly, it is HEREBY RECOMMENDED:

1.      The decision of the Commissioner of Social Security denying Plaintiff's social security disability insurance and supplemental security income benefits be vacated and the case remanded to the Commissioner of Social Security to develop the record fully, conduct a new administrative hearing and appropriately evaluate the evidence.

2.      The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: July 29, 2014

s/Gerald B. Cohn

GERALD B. COHN
UNITED STATES MAGISTRATE JUDGE